FRANK SPOTO, JR. *v.* HAYWARD MANUFACTURING CO.
(2365)

DANNEHY, C.P.J., DUPONT and BORDEN, Js.

Argued June 7—decision released September 25, 1984

*David S. Golub,* with whom, on the brief, were *Richard A. Silver, Stanley A. Twardy, Jr.,* and *Susann E. Gill,* for the appellant (plaintiff).

*Robert J. Cooney,* for the appellee (defendant).

BORDEN, J. The plaintiff in this products liability action was rendered quadraplegic in a swimming pool accident. The defendant is the manufacturer and distributor of a component part of the pool known as a skimmer device. The gist of the plaintiff's claim was that as he was running toward the shallow end of the pool to assist his young son who was having trouble in the water, he stepped into a hole in the deck of the pool created by the uncovered top of the skimmer device; that as a result he fell in a twisting motion into the pool, landing on the top of his head on the bottom of the pool; and that the defendant was responsible for the ease with which the cover of the skimmer device could be removed. The defendant denied that the cover of the skimmer device was off, and claimed instead that the plaintiff, intending to go swimming, dove into the shal-

low end of the pool from a location different from that of the skimmer device, striking his head on the bottom of the pool.

The jury returned a verdict for the defendant, on which the trial court rendered judgment. The plaintiff appeals[1] claiming that the court erred in three sets of evidentiary rulings. We find no error.

Certain of the facts are undisputed, as follows: On August 8, 1971, the plaintiff was a guest at the home of Amerigo and Gloria Parente. At the rear of the home was an in ground swimming pool consisting in part of a vinyl liner laid over sand. The pool, which was installed in 1970, was approximately thirty-two feet long and sixteen feet wide. The longer axis ran in a north-south direction, the northerly end being the shallow end; the shorter axis ran in an east-west direction. The skimmer device consisted of an opening into the shallow end of the pool, at water level, into which pool debris would be drawn, and a connected opening into the deck of the pool from which the debris would periodically be removed. The opening into the deck had a removable cover. The deck portion of the skimmer device was located approximately four and one-half feet from the easterly edge of the pool and ten and one-half inches from the northerly edge of the pool. It was undisputed that the plaintiff either tripped and fell, or dove, into the shallow end of the pool. When the plaintiff did not surface and the others at poolside realized that something was amiss, the plaintiff was pulled, unconscious, from the deep end of the pool. As a result of the contact between his head and the bottom of the pool, he suffered a compression fracture of the C-5 vertebra, resulting in permanent quadraplegia.

---

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (c).

The crucial factual dispute in the case concerned how, and from what location, the plaintiff entered the pool. The plaintiff claimed to have fallen into the shallow end of the pool after stepping into the uncovered skimmer device. The skimmer device was located on the easterly portion of the northerly, or shallow, end of the pool. The defendant claimed that the plaintiff dove into the pool from the westerly portion of the northerly, or shallow, end of the pool.

I

We first address the plaintiff's third claim of error, because it is the most significant and involves what the plaintiff describes in his brief as the key evidence in the case. This evidence was the testimony and two exhibits prepared by Richard Stone, a physicist presented as an expert witness by the defendant. Stone had done research and performed experiments on the causes of swimming pool accidents.

The evidence challenged by the plaintiff on appeal concerns Stone's testimony describing his examination of the pool on November 10, 1981, more than ten years after the accident; a plaster cast and fiberglass replica of an indentation which he found in the bottom of the pool as a result of that examination; and certain opinions which he gave linking that indentation to the plaintiff's injuries. An understanding of the admissibility of Stone's testimony, however, requires, first, a recitation of the prior testimony of Hans Koch.

Koch was a swimming pool repairman who was at the Parente's pool on a service call related to the pool's filtering system, which included the skimmer device. He was the only person at the pool who claimed to have seen the plaintiff actually enter the water.

Koch testified essentially as follows: The plaintiff was sitting on a deck chair facing the shallow end of the

pool. He got up, took off his pants, stripped to his undershorts, walked to a point about three feet easterly from the northwesterly corner of the pool, which was at the shallow end, and made a perfect shallow dive into the water. The plaintiff's chest hit the water first, and his arms were extended straight out with the hands up. The dive was very close to the kind of perfect shallow water dive that an olympic swimmer would make. Koch could not see if the plaintiff hit the bottom or not. About a minute later, he and the others at the pool pulled the plaintiff, who was blue in the face and unconscious, from the deep end of the pool. A written statement of Koch, including a rough diagram of the location and direction of the plaintiff's dive into the pool, was introduced into evidence by the defendant without objection.

Stone testified essentially as follows: There are two mechanisms that can result in someone diving nearly flat into water and an instant later being rotated straight to the bottom. The first mechanism, which he described as the diver tripping over his arms, occurs if the diver, by trying to force his arms back over his head, resists the natural tendency of his hands and arms to be pushed down as he goes into the water. This resistance results in the vertical movement of the arms stopping, the upper part of the trunk rotating over the arms, and a dive towards the bottom. The second mechanism, which he described as the diver tripping over his trunk, occurs if the diver, after entering the water, ducks his head down and relaxes at the waist. This results in the force on the back of his head pushing the head and trunk down, and the diver being pushed into the bottom of the pool. These two mechanisms can occur in the three foot water level of a swimming pool. The defendant introduced videotapes of dives which Stone had made demonstrating these mechanisms.

On November 10, 1981, Stone examined the entire bottom of the Parente's pool, under water in a wetsuit.

The examination was done both visually and tactually. He found an indentation in the bottom of the pool. The indentation was elliptical in shape, roughly eight inches by six inches. The longer axis of the indentation lined up with the longer dimension of the pool; it started out very shallow and got progressly deeper, to a maximum depth of one-half inch. He found no other significant indentations in the bottom of the pool. On the basis of the facts that from August 8, 1971, to November 10, 1981, the water had not been drained from the pool; that the bottom of the pool was sand covered by a vinyl liner which had not been changed; that the pool was subject to normal use in that intervening ten year period; and that, in his opinion, there were no forces acting on the bottom of the pool sufficient to change the configuration of the indentation, Stone expressed the opinion that the lapse of time between the date of the accident and his examination of the pool would not change the configuration of the dent. By employing a method of reproduction of the indentation, the accuracy of which is not in issue here, he was able to make an accurate plaster cast and fiberglass replica of the indentation, both of which were introduced into evidence.

In response to a series of hypothetical questions, Stone also testified essentially as follows: The indentation that he found was probably caused by the plaintiff's dive as described by Koch. That indentation and its location[2] are consistent with the type of injury suffered by the plaintiff and with the location at which his body was recovered from the deep end of the pool.

[2] The plaintiff claims that Stone's location of the indentation is inconsistent with the version of the accident given by Koch, who testified that the plaintiff dove from the westerly side of the shallow end of the pool. There is some confusion in the record about the precise location of the indentation. In a voir dire in the absence of the jury before the admission of his testimony and exhibits, Stone described the location of the indentation in two somewhat inconsistent ways. First, he located the indentation approximately ten feet out from the shallow, or northerly, end of the pool, and

The plaintiff mounts a three part attack on Stone's testimony and the exhibits which accompanied it. He first argues that an insufficient factual foundation was laid connecting the indentation and the plaintiff's accident. We disagree.

"Whether a witness is qualified to testify as an expert with respect to a certain matter is a decision to be made by the trial court. . . . That decision will not be disturbed on appeal unless there has been an abuse of discretion or there was a clear error involving a misconception of the law. . . . It is rare for this court to find that a trial court has erred in a ruling permitting expert testimony. . . . Once the trial court has determined that the witness has reasonable qualifications to testify as an expert on the question presented, the objection goes to the weight rather than the admissibility of the testimony." *McKiernan* v. *Caldor, Inc.,* 183

approximately five feet in from the *easterly* edge of the pool. Later in the same voir dire, however, he used a map of the pool which had been introduced into evidence to locate the dent at a place ten feet four inches out from the shallow, or northerly, end of the pool, and five feet in from the *westerly* edge of the pool. After the plaintiff's objections were overruled, in the presence of the jury, Stone located the indentation approximately ten feet out from the shallow end of the pool and five feet in from the *east wall* of the pool. Later in his testimony, however, in response to a hypothetical question posed by the defendant's counsel, his testimony was susceptible of an interpretation that the location of the indentation was on the *westerly* side of the pool. In cross-examination by the plaintiff, again referring to the map, he located the indentation on the *westerly* side of the pool.

These inconsistencies are not significant in this appeal, however. First, there was evidence locating the indentation on the westerly side of the pool. The trial court was entitled to rely on that evidence, even though there was contrary evidence, in making its evidentiary ruling. This is so particularly where, as here, the inconsistency in precise location was not brought to the court's attention by the plaintiff's objection to the evidence. Indeed, our review of the transcript indicates that the plaintiff's counsel considered the location by Stone of the indentation to be on the *westerly* side of the pool. Second, Stone consistently testified that the indentation, as it was configured and *where he found it,* was consistent with Koch's version of how the plaintiff entered the pool and where the plaintiff was found unconscious in the pool. Thus, any such inconsistencies were grist for the mill of cross-examination, and not a ground of inadmissibility.

Conn. 164, 167–68, 438 A.2d 865 (1981). The question of whether a sufficient foundation was laid is a factual question for the court. "[W]here the admissibility of evidence depends upon a preliminary question of fact, to be determined by the court, its decision is not to be reversed unless there is clear and manifest error." *Engelke* v. *Wheatley,* 148 Conn. 398, 411, 171 A.2d 402 (1961). A hypothetical question is not required to include all the pertinent facts in evidence. *Donch* v. *Kardos,* 149 Conn. 196, 201, 177 A.2d 801 (1962); *Nielsen* v. *D'Angelo,* 1 Conn. App. 239, 247, 71 A.2d 560 (1984). "[T]he facts assumed therein must be sufficient to justify a definite and intelligent opinion." *Stephanofsky* v. *Hill,* 136 Conn. 379, 384, 71 A.2d 560 (1950).

The hypothetical questions posed to Stone asked him to assume the following facts: The plaintiff dove into the pool as testified to by Koch. He weighed 185 pounds and was five foot eleven inches tall. Either of the tripping mechanisms, which Stone had discovered, occurred. The plaintiff was found underwater in the westerly portion of the deep end of the pool. Thus, the questions properly incorporated facts which were already in evidence, such as the plaintiff's weight and height, Koch's description of the dive, and the location where the plaintiff was found, and also incorporated the mechanisms which Stone had already testified can occur after such a dive.

On the basis of these factual assumptions, Stone gave his opinions essentially as follows: The plaintiff's head would enter the water about eight feet out. Assuming the rotating or "tripping" mechanisms he described earlier, the plaintiff's head would strike the bottom of the pool at the location at which he found the indentation, causing that type of indentation and causing the plaintiff's injury, a compression fracture of the C-5 vertebra.

We conclude that the trial court did not abuse its broad discretion or commit clear and manifest error in finding sufficient factual foundation connecting the indentation found by Stone to the dive as described by Koch. The plaintiff's claims, which focus on such facts as that no one observed the plaintiff rotate in the water or actually hit the bottom of the pool, go to the weight of the evidence and not to its admissibility. The same can be said of the plaintiff's claims that there was no evidence that the indentation was not there before the accident, and that Stone admitted on cross-examination that it was possible that the indentation was formed by workmen when the pool was built. " 'Testimony of conditions after the happening of an event is relevant to show conditions at the time of the event if the conditions are of such a permanent character that a lapse of time would not make a material difference.' " *State v. Schaffer,* 168 Conn. 309, 317–18, 362 A.2d 893 (1975). "It was not necessary [for admissibility] that the [defendant] prove by evidence equivalent to a mathematical demonstration that the [indentation] had been made by the [plaintiff] at the time of the accident. It was enough if there was evidence from which it could be found that it was reasonably probable that [it] had been." *Engelke v. Wheatley,* supra, 410.

The plaintiff next argues that, even if there was a sufficient factual foundation laid connecting the indentation to the plaintiff's dive, there was an insufficient factual showing that the dent was in substantially the same condition in November, 1981, as it would have been in August, 1971. This argument is without merit.

There was evidence that, in that intervening period, the water was not removed from the pool, that the vinyl liner was not changed, and that the pool was subject to normal use. There was also evidence that the surface underneath the liner was sand which was compacted by the weight of the water. On the basis of these

facts, Stone testified in essence that it was probable that an indentation caused by the plaintiff's head in 1971 would remain in substantially the same condition until November 10, 1981, when he made his inspection; and that it would have taken something like the force of a steam roller or of the dropping of a cannon ball into the water to change the indentation which he found. Clearly, under these unique factual circumstances there was sufficient evidence for the trial court to reject the plaintiff's argument, as do we, even after a lapse of ten years from the date of the accident to the date of the examination of the pool. The plaintiff's claims in this regard all go to the weight, rather than to the admissibility, of Stone's opinions.

The plaintiff's final argument against the admissibility of Stone's testimony is that Stone was permitted, in giving his opinions, to use assumptions about the thrust, speed and take-off angle of the plaintiff's dive which had no basis in the evidence. Like the plaintiff's other arguments regarding Stone's testimony, this argument fails.

Stone testified in this regard essentially as follows: The trajectory of a diver the size of the plaintiff is determined by how fast he takes off, which is a measure of the strength of his legs, the spring he puts into the dive and the angle that he chooses. On the basis of reasonable estimates of the amount of spring such a diver puts into a dive, of his height and of the angle of take off, one can predict his point of entry, his speed, and the angle of entry into the water. Assuming the diver is reasonably athletic, is capable of jumping vertically eighteen inches and takes off at an angle of fifteen degrees, he will enter the water at a downward angle of twenty-five degrees, and at a speed of 7.2 miles per hour. Varying the take-off angle to thirty degrees will result in an entry angle of thirty-five degrees and a speed of 7.3 miles per hour. These assumptions and the

conclusions flowing from them were part of the basis for Stone's opinion that the dive described by Koch caused the indentation which Stone found and caused the plaintiff's injuries.

There was testimony of the plaintiff's height and weight. There was also evidence from which Stone could infer that the plaintiff was reasonably athletic. This evidence was the plaintiff's own testimony that he knew how to swim, having learned at camp as a child and having swum in the navy, and Koch's testimony that the plaintiff performed a perfect shallow water dive in a manner close to that of an olympic swimmer. Koch's testimony also supplied a reasonable basis for Stone's assumption regarding the angle of take off. The fact that there was no specific evidence that the plaintiff was able to jump eighteen inches vertically is far from fatal to the admissibility of Stone's opinion. It was reasonable for Stone to assume that someone who had the athletic ability to perform the dive described by Koch also had the ability to jump eighteen inches vertically. Whether that assumption was valid in this particular case, and the effect of that validity, or the lack thereof, on the value of Stone's opinion are matters which fall within the ambit of cross-examination, and go to the opinion's weight, rather than to its admissiblity.

A hypothetical question " 'should contain such assumptions of facts . . . as counsel may fairly claim that the evidence in the case tends to justify . . . .' " *Johnson* v. *Toscano,* 144 Conn. 582, 591, 136 A.2d 341 (1957). It need not contain all the pertinent facts in evidence; *Donch* v. *Kardos,* supra; as long as the facts assumed are sufficient to justify a definite and intelligent opinion. *Stephanofsky* v. *Hill,* supra. The proper standard for appellate review of a trial court's decision permitting expert opinion testimony is whether there has been an abuse of discretion or clear error involving miscon-

ception of the law; and a ruling permitting such testimony will rarely be disturbed on appeal. *McKiernan v. Caldor, Inc.,* supra. Gauged by this standard, we cannot find that the trial court abused its broad discretion, or committed clear error misconceiving the law, in admitting Stone's opinions.

## II

The plaintiff also claims error in a ruling of the trial court permitting certain testimony of Gloria Parente. Parente testified that, after the accident, she observed "an indentation in the bottom of the pool, approximately at the spot that [the plaintiff] would have hit when he dove into the pool." The plaintiff argues that this testimony was inadmissible because it permitted Parente, as a layperson, to render an opinion on the basis of facts which she had not personally observed and which were not supported by the physical evidence. The plaintiff claims that Parente had no personal knowledge that the plaintiff dove into the pool, and that there was no basis for her claim that he hit in the area of the dent that she found. We disagree with the plaintiff's argument.

This testimony must be viewed in the context of the other parts of Parente's testimony, which were essentially as follows: She had vacuumed the bottom of the pool on the day of the accident, prior to the arrival of the plaintiff and his family. Vacuuming the pool involves actually getting into the water and running a pool vacuum over its bottom. Just before the plaintiff entered the pool, he said to her: "Aunty Glor, I am going to go in for a swim now." She saw him take his clothes off, he was in his underwear, and he started to move toward the pool. At this point he was facing the pool, less than five feet from its westerly edge and he was approaching the shallow end. She turned away to remark to the plaintiff's father-in-law, who was also

at poolside, about the fact that the plaintiff was in his underwear. She next saw the plaintiff, a minute later, unconscious, at the bottom of the deep end of the pool, on the westerly side. Later that same day, she visited the plaintiff in the intensive care unit of the hospital after he regained consciousness. When she started to cry, the plaintiff said: "Don't cry, Aunty Glor." She said: "Frank, you could have killed yourself." He said: "I'm sorry, Aunty Glor, I almost made it. I thought I could." The next day,[3] she was vacuuming the bottom of the pool and found an indentation at the spot where the plaintiff would have hit when he dove into the pool. She immediately clarified the location of the dent as about one foot in from the westerly side of the pool, at the point where the pool begins to slope from shallow to deep.[4]

"It is permissible to admit into evidence the 'opinions of common observers in regard to common appearances, facts and conditions . . . in a great variety of cases.' " *State* v. *Schaffer,* supra, 318. " 'Because of the wide range of matters on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused, will not constitute reversible error.' " Id., 319.

Although Parente did not specifically see the plaintiff actually dive into the pool, there was sufficient testimony from her own observations for her to describe his entry into the water as a dive. He told her he was going in for a swim. She saw him taking off his clothes and approaching the shallow edge of the pool, prepara-

[3] Although on direct examination she did not specifically say that this took place the next day, answering only the question of whether "after the accident occurred" she had vacuumed the pool and what she found, on cross-examination she testified that this was "[t]he next day."

[4] That point of slope was later located as approximately ten feet from the northerly, or shallow, edge of the pool.

tory to doing so. She next saw him a minute later, in the deep end, unconscious. It was undisputed that he was clad in his underwear when he was pulled from the pool. It was also undisputed that he either tripped and fell, or dove, into the pool. That very day, after regaining consciousness, he made statements to her which were certainly consistent with a dive, rather than a trip and fall, into the pool. Moreover, it was made clear to the jury in cross-examination that she did not actually see him dive into the pool. Under these circumstances, we cannot find that the court abused its discretion in permitting her to describe his entry into the pool as she did.

We also reject the plaintiff's claim based on the fact that Parente did not specifically testify that the dent was not there before the plaintiff's accident. She testified that she vacuumed the pool the day of the accident, and that when she vacuumed the pool the next day she found the dent. It was not incumbent on the defendant to establish with mathematical certainty, as a precondition of what Parente did find the next day, that it was not there the previous day. *Engelke* v. *Wheatley,* supra.

The plaintiff also takes issue with that part of the ruling permitting Parente to characterize the location of the dent which she found as "approximately at the point that [the plaintiff] would have hit" when he dove into the pool. Because of Parente's observations of the plaintiff just prior to the accident, her conversations with him after the accident, her reference to the location as only "approximately" at the point where he would have hit, and her immediate clarification of that location in terms based, not on her opinion, but on her own observations, we do not think that the trial court abused its wide discretion in permitting this expression of lay opinion. *State* v. *Schaffer,* supra.

Even if the ruling was error, however, we are convinced that it was harmless. "The [plaintiff has] the burden of showing that the error was probably harmful to [him], which involved a showing that the error was likely to affect the result." *Enterprise Leasing Corporation* v. *Dixon,* 1 Conn. App. 496, 500, 472 A.2d 1300 (1984). We do not think that this error, if any, was likely to affect the result of this case.

First, there was abundant and clear evidence from Koch, prior to Parente's testimony, that the plaintiff dove into the pool at a location and in a direction which were generally consistent with Parente's testimony. Thus, her characterization of his entry into the pool as a dive was merely cumulative of eye-witness testimony which the jury had already heard. Second, the sole characterization by Parente of the location of the dent was promptly followed by a specific description of its location in the bottom of the pool. That description was based on Parente's own personal observation. Third, she was subjected to full cross-examination, in which it was made clear to the jury that she did not see the plaintiff dive into the pool and that her characterization of the location was merely an assumption. Fourth, and most important, it is quite clear that the critical evidence in the case linking an indentation in the bottom of the pool to the plaintiff's injuries was that of Stone, which we have determined was properly admissible. His testimony and exhibits were dependent on Koch's testimony, and not in any way dependent on Parente's testimony. The fact of an indentation found by Stone was dramatically demonstrated by the fiberglass replica of it. The trial consumed ten weeks of presentation of evidence. Parente's entire testimony, both direct and cross-examination, consumes 199 pages of transcript. Stone's consumes 696 pages, involving six days of testimony. Under these circumstances, we can only conclude that permitting Parente to testify as she did was not likely to affect the result.

## III

The plaintiff's final argument concerns testimony of, and an exhibit prepared by, Jay Black, a consulting engineer and land surveyor. On August 14, 1979, Black performed a survey of the pool, a map of which was admitted into evidence over the plaintiff's objection. The map indicates three ridges in the liner on the floor of the pool. The ridges, which are approximately three feet long and which run in an east-west direction, measure approximately one foot between the first and third ridge. They are located generally about five feet from the westerly edge of the pool and nine to ten feet from the northerly end of the pool. After proper cautionary instructions from the court limiting the use of Parente's statement to him, Black testified that Parente "indicated to me there were ridges in the bottom of the pool, which she alleged was [sic] a result of the subject accident." Parente had also testified in effect that she pointed out to Black, in 1979, the dent that she observed in 1971.

The plaintiff argues that Black's testimony about and depiction of the ridges was inadmissible because (1) they were based on Parente's testimony, which he claims was improperly admitted; and (2) there was no showing that what Black observed and measured in 1979 was substantially the same as what Parente observed in 1971. We disagree.

We note, first, that Black took all his measurements and made all his observations from poolside. He did not enter the water, as had Parente when she vacuumed the pool. Thus, what Parente described as a dent in the bottom of the pool, observed by her while vacuuming the pool in the water, could also, as the trial court aptly observed, have been described as ridges by someone at poolside.

We have already determined that there was no harmful error in permitting Parente to testify as to the dent and its location based on her observations the day after the accident. We also conclude that there was a sufficient factual link between what Parente observed in 1971 and what Black observed and measured.

As we have noted, "where the admissibility of evidence depends upon a preliminary question of fact, to be determined by the court, its decision is not to be reversed unless there is clear and manifest error." *Engelke* v. *Wheatley,* supra, 410–11. Parente testified that the condition of the pool had not changed materially since the day of the accident. She testified in effect that she showed Black, in 1979, from poolside, what she observed in the water in 1971. Black's testimony confirmed that she showed him what she had observed. Furthermore, Black testified on cross-examination that the type of ridges he observed could not be caused by pool activity or by someone's hands. The differences in description and possible differences in location between what Parente observed and what Black observed and measured were matters for cross-examination going to the weight of the challenged evidence, rather than to its admissibility. Under these circumstances, we cannot conclude that the court committed clear and manifest error in admitting the evidence.

There is no error.

In this opinion the other judges concurred.