FRANK ZIMNY, ADMINISTRATOR (ESTATE OF HANNELORE ZIMNY) *v.* COOPER-JARRETT, INC., ET AL.
(3784)

HULL, BORDEN and STOUGHTON, Js.

Argued April 2—decision released August 5, 1986

*Joseph Adinolfi, Jr.*, with whom were *Joseph C. Morelli* and *John D. Miletti*, for the appellant (defendant Thomas W. Hogan, Jr.).

*John W. Lemega*, with whom was *George D. Royster, Jr.*, for the appellee (plaintiff).

HULL, J. This negligence case arose out of a very complicated multivehicle accident which occurred on January 13, 1976, on an icy area of Interstate 84 (I-84), eastbound, in New Britain. The plaintiff's decedent, Hannelore Zimny, got out of the driver's seat of her

damaged car and walked around to the passenger side to help her mother get out of the car. While helping her mother, she was struck by a vehicle and received injuries which resulted in her death forty-five days later. The plaintiff administrator sued nine defendants, eight of whom, including the named defendant, settled the claims prior to or during the trial for a total of $225,000. The case proceeded against only one of the defendants, Thomas W. Hogan, Jr. (hereinafter the defendant). The jury rendered a verdict for the plaintiff in the amount of $1,074,171.90, reduced to $859,337.52 to reflect the decedent's comparative negligence of 20 percent. The defendant filed motions to set aside the verdict and for a new trial in accordance with Practice Book §§ 320 and 321, and a motion for order of remittitur, pursuant to General Statutes § 52-216a. The trial court denied all of these motions and the defendant filed this appeal.

The defendant claims that the trial court erred in several respects: (1) in charging the jury on the rescue doctrine; (2) in admitting certain testimony of the plaintiff's accident reconstruction expert; (3) in failing to set aside the verdict and order a new trial or order a remittitur; (4) in failing to rule that General Statutes § 52-216a violates the equal protection provisions of the United States and Connecticut constitutions; and (5) in failing to set aside the verdict and render judgment for the defendant on the basis of insufficient evidence of negligence.

The parties stress conflicting testimony concerning key factors in the accident. A summary of the undisputed evidence and the areas in which the parties disagree follows. On January 13, 1976, between 2 p.m. and 2:15 p.m., Hannelore Zimny was driving her car in an easterly direction on I-84. She was travelling in the extreme left lane. Her mother, Frieda Zimny, was a passenger in the right front seat. At approximately the same time, a car operated by Hiam J. Lundy was

proceeding easterly on I-84. At a point just east of the Plainville-New Britain line, Lundy's car passed over an ice-coated bridge and went out of control, running into a snowbank on the right hand side of the highway. As Lundy backed his car out of the snowbank onto the highway, he was struck by an unidentified tractor trailer truck travelling in the right hand lane. This truck skidded out of control and came to rest blocking the right lane and a portion of the center lane of the highway. At the same time, the defendant was operating his car eastbound on I-84, driving in the center lane.

The defendant stresses the following evidence: While driving on I-84, he felt two hard impacts on the rear of his car. The first impact was so hard that the trunk lid on his car popped up, blocking his view of the car that struck him. Approximately ten seconds later, he felt the second of the two blows. After the second blow, his car came to a complete stop on the left hand side of the highway. The Zimny car, which the defendant later learned was the car that hit him, came to rest to the rear of his car near the left side of the highway.

The plaintiff stresses entirely different testimony as follows: As the plaintiff's decedent's car and the defendant's car approached the site of the Lundy collision, the defendant, whose speed exceeded the plaintiff's decedent's, started to pass. The defendant saw that the road ahead was obstructed but nevertheless elected to drive through the obstruction. As he passed the vehicle of the plaintiff's decedent, his car fishtailed and its left rear skidded and struck the plaintiff's decedent's passenger side door. That impact caused Zimny's car to rotate in a counterclockwise direction until its front hit the highway curbing. The defendant's car continued to fishtail until its rear collided with the highway retaining wall. As a result of the impact, Zimny's car came to rest in the left lane of I-84.

Certain other testimony is not in dispute. After the accident, Zimny went around the car to get her mother out because she was concerned about the possibility of leaking gasoline. At this point, two tractor trailers being operated in the right and center lanes of I-84 came on the scene. The tractor trailer in the right lane was owned by Cooper-Jarrett, Inc., and driven by Henry Miller, Jr. As he approached the accident scene, Miller applied his brakes and jackknifed, hitting a van owned by Casson-Matava, Inc., and driven by Dominic A. Angelo. The Angelo vehicle then struck a Pontiac Firebird driven by Stephen H. Bouchner. The Cooper-Jarrett trailer then collided with another tractor trailer owned by Edart, Inc., and driven by John J. McCarthy. The Edart trailer collided with the Zimny vehicle at the moment Zimny was attempting to assist her mother. This collision pinned Zimny between her vehicle and the Edart trailer. The Edart trailer also pushed the Hogan vehicle against the side of a northerly bridge abutment. Fifteen to twenty seconds elapsed between the end of the Hogan-Zimny collision and the collision involving the tractor trailer truck and the Hogan and Zimny cars. The road surface in the area was icy and slippery. By 7:15 p.m., an eastward moving ice storm had reached the accident scene. As a result of glare ice, no tire or skid marks were left by any of the vehicles involved.

I

### THE COURT'S CHARGE TO THE JURY ON THE RESCUE DOCTRINE

This issue raises the thorny question, not previously considered by an appellate court in Connecticut, as to the application of the rescue doctrine in a comparative negligence situation.

The rescue doctrine was first promulgated by Cardozo, J., in *Wagner* v. *International R. Co.*, 232

N.Y. 176, 133 N.E. 437 (1921), in which the court stated: "Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperilled victim; it is a wrong also to his rescuer. The state that leaves an opening in a bridge is liable to the child that falls into the stream, but liable also to the parent who plunges to its aid . . . . The railroad company whose train approaches without signal is a wrongdoer toward the traveller surprised between the rails, but a wrongdoer also to the bystander who drags him from the path . . . . The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had . . . ." (Citations omitted.) Id., 180.

The Supreme Court established the doctrine in Connecticut in the landmark case of *Cote* v. *Palmer,* 127 Conn. 321, 16 A.2d 595 (1940). The plaintiff's decedent, the mother of an eight year old daughter, was killed by the engine of the defendant's train. Her death was a result of her running towards the track in an attempt to move away the daughter who was too close to the track. The court concluded that the jury could have found the defendant negligent. It then went on to consider the question of the mother's contributory negligence.

"The question as to contributory negligence on the part of the decedent requires consideration of the so-called 'rescue doctrine,' for only under that doctrine could she be held free from such negligence. It is succinctly stated in the Restatement as follows: 'It is not contributory negligence for a plaintiff to expose himself to danger in a reasonable effort to save a third per-

son or the land or chattels of himself or a third person from harm.' 2 [Restatement] Torts § 472. In general support of this principle, the following cases, out of many, may be cited: *Eckert* v. *Long Island R. Co.,* 43 N.Y. 502 [1871]; *Wagner* v. *International Ry. Co.,* [supra, 180]; *Dixon* v. *New York, N.H. & H. R. Co.,* 207 Mass. 126, 129, 92 N.E. 1030 [1910]; *Perpich* v. *Leetonia Mining Co.,* 118 Minn. 508, 512, 137 N.W. 12 [1912]; *Bond* v. *Baltimore & Ohio R. Co.,* 82 W. Va. 557, 560, 96 S.E. 932 [1918]; see also 3 Elliott, Railroads (3d Ed.) § 1814; note 19 A.L.R. 4. The statement quoted contains in itself a limitation, for it only applies where the effort to save is 'reasonable' and it suggests a question as to the elements involved in determining what effort is to be deemed reasonable. The answer to that, so far as it admits of an answer, is that the same standard generally used in testing whether or not an act is negligent is to be applied; that is, the conduct of an ordinarily prudent person in the same circumstances as the plaintiff. 'The question in such a case is not what a careful person would do, under ordinary circumstances, but what would he be likely to do . . . in the presence of such existing peril.' *Pittsburg, C., C. & St. Louis Ry. Co.* v. *Lynch,* 69 Ohio St. 123, 131, 68 N.E. 703 [1903]. Among these circumstances, as the Restatement points out, are undoubtedly the seriousness and imminence of danger, both to the person threatened and the rescuer, and the likelihood or unlikelihood that harm to the former can be averted. Beyond that, an outstanding factor is the instinctive reaction of human nature to the need of one in danger, and where he stands in a close relationship of blood or affection to the rescuer, as in a case like this, a young child to her mother, the reactions naturally incident in such a case. . . .

"The mere presence of danger and desire to save person or property from injury or destruction will not alone

suffice. To venture life where there is no possibility of saving or where the danger is not great or the possibility of loss serious, may go beyond the limit of that which is legally permissible. . . . It . . . accords with the analogies of the law to apply the usual standard of conduct, that is, the conduct of an ordinarily prudent person under the same circumstances. The standard is the same upon which contributory negligence is always to be determined, but in a case like the one before us, it necessarily involves such circumstances as those which have been mentioned. Requiring as it does in a situation where a mother loses her life in an effort to save her child from serious injury or death, an understanding of the ultimate springs of human conduct, there is a peculiar value in submitting the issue to the judgment of the twelve men or women of the jury, schooled, as they have been, by their various experiences in life. It must be a rare and clear case where a court could override their conclusion.

"In the situation before us we have, in the protective instinct of motherhood, one of the strongest incentives to the risk of life; the jury might reasonably conclude that there was imminent danger of death or serious bodily injury to the child and an instinctive reaction to that danger on the part of the mother; and, had the child actually come upon the track in the face of the approaching train, the mother would have barely failed to reach her before it would have been too late. That her sacrifice did not avail to stop the child before she reached the track, cannot be determined from this record; but even if that sacrifice in the ultimate proved unnecessary, that could not affect the decedent's rights, for they were to be determined upon the facts as she might reasonably have believed them to be. *Thoresen* v. *St. Paul & Tacoma Lumber Co.*, 73 Wash. 99, 103, 131 Pac. 645, 132 Pac. 860 [1913]; *Corbin* v. *Philadelphia,* 195 Pa. St. 461, 469, 45 Atl. 1070 [1900]. It is

true that there must have been a moment when a calm observer would have seen that she could not reach the child in time to protect her and that unless she immediately stopped she would be struck by the train, but her conduct is to be judged, not in the light of cold reason, but in view of the aroused emotions which would animate a mother situated as was the decedent, and of the lack of opportunity for deliberation and the exercise of a cool judgment. . . . We cannot hold that, as matter of law, the decedent's conduct was not that of a reasonably prudent person in like circumstances, using those words in the sense we have stated . . . ." (Citations omitted.) *Cote* v. *Palmer,* supra, 326–30; accord *Cummings* v. *General Motors Corporation,* 146 Conn. 443, 451–52, 151 A.2d 884 (1959). The *Cote* statement of the underlying principles of the rescue doctrine is well established law.

A recent case formulated the rule as follows: " 'Where a defendant's negligent act, of commission or omission, has created a condition or situation which involved urgent and imminent peril and danger, to life or property, of himself or of others, those acts of negligence are also negligence in relationship to all others who, in the exercise of ordinary care for their own safety under the circumstances, short of rashness and recklessness, may attempt, successfully or otherwise, to rescue such endangered life or property, by any means reasonably appropriate to the purpose. . . .' " *Turpel* v. *Sayles,* 692 P.2d 1290, 1291 (Nev. 1985).[1]

---

[1] Under the rule cited by *Turpel* v. *Sayles,* 692 P.2d 1290 (Nev. 1985) the rescuer's actions must be short of rashness or recklessness. Other cases use wanton conduct to limit the rescuer's right to invoke the rescue doctrine. The diverging but overlapping tests developed in a host of cases is ably discussed in the concurring opinion by Sutin, J. in *Padilla* v. *Hooks International, Inc.,* 99 N.M. 121, 123, 654 P.2d 574 (1982). The law in Connecticut confines the application of the rescue doctrine to one who makes a reasonable effort to effect a rescue. This follows the rule formulated in 2 Restatement (Second), Torts § 472.

In the case before us, the court explained in its charge the doctrines of contributory negligence and comparative negligence and their application to the facts of the case.[2] The defendant properly excepted to the charge

[2] The court charged the jury on the rescue doctrine as follows: "Now with respect to the rescue doctrine, the defendant Thomas Hogan has made several allegations of comparative negligence against Hannelore Zimny. One of these allegations is that she failed to use reasonable care for her own safety under the circumstances and conditions. Although the allegation of the answer is not specific, the defendant has argued, in effect, that Hannelore Zimny should not have gotten out of her car in an attempt to rescue her mother. You will recall that Hannelore Zimny was struck while she was standing in the highway attempting to open the passenger side door.

"I charge you that with respect to the question of contributory negligence, you must bring to bear upon that question the same tests and considerations which you have brought to bear on the issue of Mr. Hogan's negligence in the first instance. In other words, you must find that the act or acts were negligent, and you must find that the act or acts in question were a proximate cause of the accident which led to her eventual death.

"Now, in respect to the possible comparative negligence of Hannelore Zimny, there is a doctrine in the law which you may consider when viewing her conduct. That doctrine is known as the rescue doctrine. Succinctly put, that doctrine states that it is not contributory or comparative negligence for a person to expose himself or herself to danger in a reasonable effort to safely [rescue] a third party. You will note that I have used the word 'reasonable.' The rescue doctrine applies only where the effort being made to save another person is reasonable under the circumstances. The conduct of the person doing the rescuing, however, must be judged under the circumstances.

"You may find that the circumstances in the case were a sudden emergency which Miss Zimny was confronting. If you find that she was reasonably confronting a sudden emergency, then her conduct is to be judged not in the light of cold reason, but in view of the emotions which a daughter might have for her mother under the circumstances, and you will take into consideration her lack of opportunity for deliberation and the exercise of cool judgment.

"In other words, the rescue doctrine has several parts to it. These parts are as follows: (1) you must consider the circumstances of Miss Zimny's conduct; (2) if you find that at the time she attempted to rescue her mother, she was reasonably faced with a sudden emergency and reasonably had fear that her mother might be injured if she did not act; then, (3) you may consider her conduct under the circumstances and you should not judge her as a person who has time for cool deliberation, but a person who may have had aroused emotions for the safety of her mother and acted quickly in a reasonable effort to safely [rescue] her mother from danger.

on the grounds that "[t]he rescue doctrine, in our judgment, is not applicable in this case since the rescuer may be guilty of contributory negligence when he himself has brought about or helped to bring about the danger, and it is our position that Hannelore Zimny either brought about or helped to bring about the danger from which she attempted to extricate her mother."[3]

The defendant agrees that, as far as it went, the court's charge on the rescue doctrine was correct. He argues, however, that the court erred in not charging the jury that the rescue doctrine cannot be invoked by a rescuer who has contributed to placing the victim in a position of peril. It is beyond question that this limitation on the doctrine is universally accepted in cases where a plaintiff's contributory negligence acts as a complete bar to recovery. *Sulphur Springs Valley Electric Cooperative, Inc.* v. *Verdugo,* 14 Ariz. App. 141, 144, 481 P.2d 511 (1971); *Klang* v. *Shell Oil Co.,* 17 Cal. App. 3d 933, 938–40, 95 Cal. Rptr. 265 (1971); *Air-line Railway Co.* v. *Leach,* 91 Ga. 419, 422, 17 S.E. 619 (1893); *Tarnowski* v. *Fite,* 335 Mich. 267, 269–70, 55

"You may find that the rescue doctrine is particularly applicable when the rescuer stands in a close relationship of blood or affection to the person being rescued. So much for rescue."

This charge was substantially similar to the plaintiff's request to charge.

[3] The defendant expatiated this objection to the charge in a later exception. "[MR. ADINOLFI:] Yes, your Honor. It's our position that the rescue doctrine here was inapplicable. The case in 127 Connecticut on which your Honor relies is a case in which a mother exposed herself to danger by attempting to warn her child from the railroad tracks and the mother had nothing whatever to do to placing that child in the position of danger. And we have found a case in the court of appeals of Arizona—we don't have—that specific question of whether or not the plaintiff has placed the rescuee in the position of danger has not come up in Connecticut, but it has come up in the court of appeals of Arizona in *Sulpher Springs Valley Electric Cooperative Inc.* v. *Doris Verdugo* in 481 Pacific 2d at 511, and that follows the restatement of torts doctrine, Restatement 2d of Torts, section 472, in which it is clear that the rescue doctrine does not apply if the plaintiff himself or herself had anything to do with putting the person to be rescued in that position of danger."

N.W.2d 824 (1952); *Padilla* v. *Hooks International, Inc.,* 99 N.M. 121, 123–24, 654 P.2d 574 (N.M. App. 1982); 2 Restatement (Second), Torts § 472, comment a; annot., 158 A.L.R. 189; 57 Am. Jur. 2d, Negligence § 423.

The defendant notes that no case has been found to the contrary, nor have we found any. All of this universal authority, however, involved cases in which the claimant rescuer's contributory negligence was an absolute bar to recovery. In such cases, not only are there policy reasons to prohibit the at-fault rescuer's recovery, but, and this must be stressed, there would be no occasion to consider the rescuer's post-accident negligence since the rescuer would be barred completely by contributory negligence. Thus, the defendant's claim boils down simply to the question whether the unchallenged rule that a contributor to the peril cannot invoke the rescue doctrine survives intact under Connecticut's comparative negligence law or whether that rule is enveloped within, and in a different form becomes a part of, the doctrine of comparative negligence.

Appellate courts in jurisdictions which have adopted a comparative negligence rule have applied the rescue doctrine in cases where the circumstances warrant it. In *Cords* v. *Anderson,* 80 Wis. 2d 525, 548, 259 N.W. 2d 672 (1977), two would-be rescuers were injured attempting to rescue a companion who had fallen into a gorge. In analyzing the effect of comparative negligence on the rescue doctrine the court stated: "We hold that a rescuer is not negligent where the rescue, although dangerous, is not unreasonable or unreasonably carried out. In a comparative negligence jurisdiction such as Wisconsin, if the trier of fact finds that the rescue is unreasonable or unreasonably carried out the fact finder should then make a comparison of negligence between the rescuer and the one whose negligence created the situation to which the rescue was a response."

In *Ryder Truck Rental, Inc.* v. *Korte,* 357 So. 2d 228, 230 (Fla. App. 1978), which involved a police officer injured when he sought to aid the victim of an automobile accident, the Florida Court of Appeals analyzed the question of what effect, if any, the adoption of comparative negligence had upon the rescue doctrine. It concluded as follows: "Now that Florida has abolished contributory negligence [as an absolute defense], the rescue doctrine is no longer needed to allow a rescuer to recover in spite of his contributory negligence, but there is no logical reason why the principles of comparative negligence should not apply in a rescue case. We therefore hold that when the plaintiff in performing a rescue is himself negligent, he should recover only that portion of the entire damages sustained by him as the defendant's negligence bears to the combined negligence of both the plaintiff and the defendant."

In *Sweetman* v. *State Highway Department,* 137 Mich. App. 14, 357 N.W. 2d 783 (1984), the plaintiff attempted to aid a motorist allegedly injured as the result of the negligent maintenance and design of a highway overpass. The Michigan Court of Appeals closely followed the analysis of *Ryder.* In so doing, the court extensively discussed the effects of the adoption of a comparative negligence standard on the policy behind the rescue doctrine: "When contributory negligence was the prevailing rule the rescue doctrine served a dual purpose: (1) it helped establish a causal connection between the defendant's negligence and the plaintiff's injury, and (2) it served to eliminate the absolute defense of contributory negligence. *Ryder Truck Rental, Inc.* v. *Korte,* [supra]. The doctrine helps to establish proximate cause by providing that where a defendant has created a situation of peril for another the defendant is held to have caused the peril not only to the victim but also to his rescuer. . . . This aspect of the rescue doctrine is wholly viable even in the wake

of judicial abrogation of the contributory negligence defense. However, since allocation of negligence to the plaintiff under a system of comparative negligence is not a bar to the plaintiff's recovery, the second attribute of the rescue doctrine is no longer compelling. Stated alternatively, we perceive no harsh result from the application of comparative negligence principles to rescue cases." *Sweetman* v. *State Highway Department,* supra, 26.

We agree with the logic of these cases and accordingly hold that the first aspect of the rescue doctrine, that it is not negligence for a plaintiff to make a reasonable attempt to save an individual from peril, survives the adoption of a comparative negligence doctrine. Where, however, the attempt is unreasonable, we find that a result different from that obtained under a contributory negligence standard should apply. The rescuer should not be absolutely barred from recovering but, rather, the amount of his recovery should be reduced by the degree to which he is comparatively negligent.

The defendant admits that there was no evidence in any of these cases that the plaintiffs had contributed to creating the perilous situation which gave rise to their rescue attempts. Therefore, these cases do not reach the narrow issue we consider. He claims, however, that *Padilla* v. *Hooks International, Inc.,* supra, 123–24, did involve this issue. He notes correctly that in *Padilla* the defendants claimed that the plaintiff would-be rescuer had negligently contributed to placing the victim in peril on a backhoe he was repairing. He quotes the majority opinion to the effect that "[t]here are two ways in which a plaintiff's own negligence can become a fact question in rescue doctrine cases. First, the plaintiff may have been negligent by helping to create the very situation which later 'invited' his rescue.

"The rule which relieves from contributory negligence one who voluntarily exposes himself to danger in order to rescue another person from peril does not apply where the rescuer is himself solely or in part responsible for the peril which confronts the one whom he attempts to save. If the third person's peril is due in part to the plaintiff's own negligence, such negligence is a contributing factor in producing any harm which he sustains in his rescue attempt." Id., 123.

The *Padilla* court thus stated the rule applicable before the advent of comparative negligence. It made no analysis, however, of the effect of comparative negligence on the rescue doctrine. That general issue was clearly enunciated by Sutin, J., concurring, who stated that the "rescue doctrine" takes on a different form when applied to the rule of comparative negligence. Id., 580.

We do not agree with *Padilla's* facile acceptance of the old rule. The rescue doctrine no longer serves the purpose of eliminating the absolute defense of contributory negligence in comparative negligence situations. Thus, the bar to its use where the rescuer contributed to the peril no longer makes sense. The purpose of this corollary rule is not applicable to a comparative negligence case and should not be gratuitously extended to that field. Accordingly, we reject the defendant's invitation to follow *Padilla*. To do so would be to distort and dilute the socially ameliorative doctrine of comparative negligence.[4] We choose instead to follow the clear path set forth in *Sweetman* v. *State Highway Depart-*

---

[4] General Statutes § 52-272 (a) provides: "In causes of action based on negligence, contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages resulting from injury to persons or damage to property, if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought. Any damages allowed shall be diminished in the proportion of the percentage of negligence attributable to the person recovering."

*ment,* supra, that the rescuer's negligence in contributing to the peril is to be considered along with all of the other negligence of the rescuer and the defendant.

We hold that the rescue doctrine applies under Connecticut's comparative negligence statute. This is so whether or not the plaintiff-rescuer contributed to the victim's peril. When the plaintiff in seeking to effect a rescue is himself negligent, he should recover only that portion of the entire damages sustained by him as the defendant's negligence bears to the combined negligence of both the plaintiff and the defendant. The defendant does not otherwise challenge the court's charge on the totality of the decedent's contributory negligence, proximate causation and comparative negligence. Accordingly, the court did not err in its charge on the rescue doctrine.

## II

### THE COURT'S ALLOWING THE PLAINTIFF'S ACCIDENT RECONSTRUCTION EXPERT ROBERT CROMWELL TO TESTIFY

The defendant claims error in three regards concerning the admission of the testimony of Robert Cromwell, the plaintiff's accident reconstruction expert:[5] (1) in allowing him to testify in violation of a court order

[5] The plaintiff claims that since the defendants' brief concerning these issues did not comply with Practice Book § 3060F (d) (3), we should not consider these claims of error. The plaintiff is correct that the defendant failed to present his evidentiary claims of error in the manner required. "Because the . . . allegations of error challenge only the trial court's exercise of discretion with regard to the admissibility of expert testimony enforcement of the Practice Book [would] cause no injustice . . . ." *Gorra Realty, Inc.* v. *Jetmore,* 200 Conn. 151, 171, 510 A.2d 440 (1986). We therefore could decline to consider the issues raised. See *Fogg* v. *Wakelee,* 196 Conn. 287, 492 A.2d 511 (1985); *Acheson* v. *White,* 195 Conn. 211, 487 A.2d 197 (1985). Notwithstanding that fact "[b]ecause the application of the rule to this case is so complex, we nonetheless choose to consider [his] claims of error on their merits." *Liskiewicz* v. *LeBlanc,* 5 Conn. App. 136, 139 n.2, 497 A.2d 86 (1985).

entered four years earlier in the case, which order precluded the use of this expert if the discovery schedule set by the court was not followed; (2) in allowing him to testify when such testimony was based upon an insufficient factual foundation which rendered his conclusions speculative and served to confuse and mislead the jury; and (3) in allowing him to testify beyond the scope of the preliminary report admitted into evidence.

A brief background of certain rulings in the case is necessary to understand the issues.

On June 4, 1979, the trial court, *Satter, J.,* ordered pursuant to the stipulation of the parties that "[t]he plaintiffs Frank Zimny and Frieda Zimny will provide to the defendants copies of the reports of any liability experts, including Mr. Cromwell, on or before July 2, 1979. These plaintiffs further agree that no expert will testify as to any matter not specifically reflected in the expert's report." The court also ordered that "it is further understood that any deviation from [the order] for a justifiable reason must be—will be permitted only on the order of this court." On June 30, 1979, the plaintiff produced a three page document prepared by Robert M. Cromwell, which Cromwell called a preliminary report.

On August 30, 1984, the court, *Aspell, J.,* ruled that Cromwell could not testify because he had filed only a preliminary report which was not followed up by a final report as required by Judge Satter's June 4, 1979 order. The trial court concluded that such testimony would be a "complete surprise" to the defendants as to the substance of his opinion of the cause of the accident. The court also based its ruling on the case of *Going* v. *Pagani,* 172 Conn. 29, 372 A.2d 516 (1976), since Cromwell did not begin his investigation of the case until ten months after the accident and did not see the exact conditions or vehicles involved. The court

also concluded that the report was conjectural, speculative and lacked probative value. Finally, the court found that Cromwell's testimony would tend to confuse and mislead the jury since the most useful evidence would be the report of the state trooper who investigated the accident. On August 31, 1984, the jury was informed of this exclusion of Cromwell's testimony. The next day the court denied the plaintiff's motion that Cromwell's deposition be taken during the trial with respect to his accident reconstruction report. The court also ruled for a second time that Cromwell could not testify. When court reconvened on September 5, 1984, the trial court reversed its ruling stating "I just want to tell you that over the weekend I have carefully reconsidered the cases that affected my ruling with respect to the testimony of Cromwell and after much deliberation I have come to the conclusion that I will allow Cromwell to testify to *the extent of the information that he gave in the interrogatories.*" (Emphasis added.) The defendant excepted to the changed ruling as follows: (1) on the basis of earlier arguments which had resulted in the exclusion of the testimony; (2) on the basis of the court's reversal of its earlier decision; and (3) on the basis of *Going* v. *Pagani,* supra.

A

### CLAIMED VIOLATION OF DISCOVERY ORDER

The expert's "preliminary report" was submitted within the time required in the discovery order. We have examined with care the three page preliminary report. We conclude that the report is a detailed analysis of the dynamics of the accident, directly faulting Hogan as follows: "[T]he plaintiff, Hannelore Zimny, was operating her 1976 Ford in an easterly direction in the left-hand lane when Thomas W. Hogan, Jr., moved his 1966 Oldsmobile left directly into her path causing contact to be made between the right front of

the Zimny vehicle and the left rear of the Hogan vehicle." The report itself concluded by saying: "Based on the damage sustained by vehicles as a result of the various accidents as shown on [p]olice photographs, a reasonable determination of the dynamic motion of the vehicles following impact has been determined, however the reconstruction process must necessarily include all available information and it is the writer's understanding that witness depositions are presently in process and prior to rendering a final opinion with regard to the reconstruction of this accident, information obtained from the deposition will be necessary to more accurately place the vehicles in their proper relationships prior to impact. A final report will be issued after all available information is received. . . . Following the availability of witness depositions presently in process, I will complete the reconstruction study and submit my final report."

The defendant claims that Cromwell was awaiting all of the information from the deponents in order to place the vehicles in their proper relationships prior to the impact, and not just for the vehicle identification numbers as he claimed at trial. He contends that Cromwell's "final" opinion as to the pre-impact position of the cars was not available until the time of trial, and asserts therefore, that Cromwell's conclusions were a complete surprise and his testimony unfair as a result. According to the defendant, what occurred here is the kind of "cat and mouse game" which we specifically discountenanced in *Sturdivant* v. *Yale-New Haven Hospital,* 2 Conn. App. 103, 106, 476 A.2d 1074 (1984).

In *Sturdivant,* the plaintiff in a medical malpractice case disclosed the name and subject of the testimony of her medical expert during the jury selection process after initially stating in answers to interrogatories that she would use no expert. In supplemental answers to interrogatories she stated that her expert would tes-

tify as to the "standard of care and departure from the standard of care." The trial court excluded all testimony as to causation because it was beyond the scope of the disclosed subject matter of the expert's testimony. The plaintiff appealed. This court rejected the plaintiff's claim that the expert was not "formally" retained until after the trial, holding that that was a "tactical subterfuge," and upheld the court's discretionary exclusion of the proffered testimony on the basis of Practice Book § 231.

We conclude that the situation in this case is a far cry from that in *Sturdivant*. There, although the plaintiff admitted that she had consulted with the expert "informally" a few years before the trial, the very existence of the expert and the proposed subject matter of his testimony were completely *unknown* to the defendant. *Sturdivant* was a classic case of surprise and trial by ambush. Here, the defendant knew the identity of the expert and the nature of his testimony. The defendant had a detailed report in his hands and a similar response to the interrogatories. Both documents placed fault clearly on Hogan.

The defendant also claims that the trial court, in allowing Cromwell to testify "to the extent of the information that he gave in the interrogatories," violated Judge Satter's order that no expert testimony be allowed "as to any matter not specifically reflected in the expert's report" and that "any deviation from the order will be permitted only on the order of the court." We conclude that the trial court's order did not violate Judge Satter's order. The trial court's order was specifically limited to the material contained in the preliminary report. Nor has the defendant shown how the testimony deviated from the preliminary report except in very minor ways discussed below. We find that the defendant's claim of complete surprise is more apparent than real.

The trial court's order was the type contemplated in Judge Satter's original order. Even if we were to deem the trial court's order a deviation from Judge Satter's order, our Supreme Court has stated: "[A]lthough a judge should not lightly depart from a prior ruling on a motion before the same or a different judge, the prior ruling is not binding." *Barnes* v. *Schlein,* 192 Conn. 732, 734, 473 A.2d 1221 (1984).[6] A trial court's decision on whether to impose the sanction of excluding an expert's testimony concerning causation rests within its sound discretion. See *Filisko* v. *Bridgeport Hydraulic Co.,* 176 Conn. 33, 40, 404 A.2d 889 (1978); see also *Pavlinko* v. *Yale-New Haven Hospital,* 192 Conn. 138, 144, 470 A.2d 246 (1984) (discussion of sanctions pursuant to Practice Book § 231). " 'The action of the trial court is not to be disturbed unless it abused its legal discretion, and "[i]n determining this the unquestioned rule is that 'great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness.' *Dudas* v. *Ward Baking Co.,* 104 Conn. 516, 518, 133 A. 591 [1926] . . . ." *Ardoline* v. *Keegan,* 140 Conn. 552, 555, 102 A.2d 352 [1954].' *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714 [1970]. In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. *E. M. Loew's Enterprises, Inc.* v. *Surabian,* 146 Conn. 608, 611, 153 A.2d 463 [1959]." *DiPalma* v. *Wiesen,* 163 Conn. 293, 298–99, 303 A.2d 709 (1972). The trial court could reasonably have concluded as it did concerning its threshold decision to permit Cromwell to testify.

---

[6] For a case in which this court did find error in the trial court's allowing incursions into the area of expert testimony which the court had previously forbidden, see *Hartford* v. *Anderson Fair-Oaks Inc.,* 7 Conn. App. 591, 600, 510 A.2d 200 (1986).

## B

### CLAIM OF INSUFFICIENT FACTUAL FOUNDATION

The defendant claims that the case of *Going* v. *Pagani,* supra, requires the exclusion of Cromwell's testimony. In *Going,* our Supreme Court *upheld* the trial court's exclusion of Cromwell's expert testimony,[7] stating that "this opinion was not permitted since the court found [that] it was based on such conjecture and factual uncertainty as to lack any substantial probative value for the jury." Id., 33. In reaching this decision the Supreme Court noted (1) that Cromwell did not examine the accident scene until three years and two months after the accident, (2) that the road had been resurfaced in the interim, (3) that the jury had already heard testimony as to the point of impact from the operators of the vehicles involved and from police officers who arrived at the scene shortly after the accident and had observed the location of the vehicles and the debris on the roadway, and (4) that Cromwell's reconstruction of the accident, and his opinion about the crucial point of impact, were based on calculations made from photographs, the changed accident site, and the moved automobile.

We have carefully considered the defendant's arguments attempting to show the lack of a factual foundation for Cromwell's opinion in this case. Notwithstanding the defendant's assertions to the contrary, we do not consider *Going* to state an ironclad rule determinative of every case. Rather, we interpret *Going* as an example of our Supreme Court's upholding the trial court's ruling concerning the adequacy of the factual foundation of an expert's testimony. There are several significant reasons why we distinguish *Going* from the

---

[7] The parties agree that the apparently ubiquitous Cromwell was involved in both cases.

present situation. In the present case, Cromwell surveyed the scene only one and a half years after the accident. The highway had not been changed as it had been in *Going*. His testimony was not offered, as it was in *Going,* to establish the exact point of impact, but to reconstruct the sequence and pattern of the accident. Additionally, in this case Cromwell based his conclusion on several factors: the police report and measurements contained in it of the vehicles in at-rest positions after the accident; photographs of the accident scene and the damage done to the vehicles; state highway department maps; the size, weights and centers of gravity of the vehicles involved; his expert estimate of the low coefficient of friction of the icy road surface; his expert knowledge of the ways in which vehicles tend to move when they collide on an icy surface; and his own physical survey of the accident scene. Finally, the crucial facet of Cromwell's testimony concerned his conclusion that Hogan's vehicle fishtailed into Zimny's vehicle as Hogan passed Zimny. That conclusion is based on evidence from photographs and the location of the vehicles after the accident.

The defendant is correct in arguing that the factual foundation of Cromwell's opinion was weakened as to portions of his testimony which were at variance with actual witnesses. The key portion of his testimony, however, concerned the collision between the Hogan and Zimny vehicles. That testimony was consistent with that of state trooper Gaylord. Finally, Cromwell's reconstruction of this accident did not rest upon an exact mathematical place of the point of impact on the highway.

The defendant asserts that the trial court erred by admitting five overlay maps concerning the accident. In support on this claim, he contends that each lacked mathematical precision. Cromwell, however, repeated that each overlay was intended only to give approxi-

mate locations of the vehicles involved. We find that the defendant's attack on the factual foundation of Cromwell's opinion goes to the weight rather than to the admissibility of Cromwell's opinion evidence.

"Whether a witness is qualified to testify as an expert with respect to a certain matter is a decision to be made by the trial court. *Oborski* v. *New Haven Gas Co.,* 151 Conn. 274, 280, 197 A.2d 73 (1964). That decision will not be disturbed on appeal unless there has been an abuse of discretion or there was a clear error involving a misconception of the law. *State* v. *Cosgrove,* 181 Conn. 562, 588, 436 A.2d 33 (1980); *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973). It is rare for this court to find that a trial court has erred in a ruling permitting expert testimony. *Wray* v. *Fairfield Amusement Co.,* 126 Conn. 221, 224, 10 A.2d 600 (1940). Once the trial court has determined that the witness has reasonable qualifications to testify as an expert on the question presented, the objection goes to the weight rather than the admissibility of the testimony. *State* v. *Wallace,* 181 Conn. 237, 241, 435 A.2d 20 (1980); *Osborski* v. *New Haven Gas Co.,* supra." *McKiernan* v. *Caldor, Inc.,* 183 Conn. 164, 167–68, 438 A.2d 865 (1981).

" 'The facts upon which an expert's opinion is based are an important consideration in determining the admissibility of his opinion.' *Going* v. *Pagani,* supra, 34. 'The question of whether a sufficient foundation was laid is a factual question for the court.' *Spoto* v. *Hayward Mfg. Co.,* 2 Conn. App. 663, 670, 482 A.2d 91 (1984)." *Liskiewicz* v. *LeBlanc,* 5 Conn. App. 136, 141, 497 A.2d 86 (1985).

"Expert opinion testimony as to the point of impact in a motor vehicle accident is proper provided the witness has been qualified and an adequate foundation for his testimony has been laid. . . . The trial judge has

a broad discretion to determine the qualifications of an expert. . . . '[I]f any reasonable qualification can be established, the objection goes to the weight rather than to the admissibility of the evidence.' *Wray* v. *Fairfield Amusement Co.*, 126 Conn. 221, 224, 10 A.2d 600 [1940]. 'Some facts must be shown as the foundation of . . . an [expert's] opinion, but there is no rule of law declaring the precise facts which must be proved before such an opinion may be received in evidence. It is largely a matter of judicial discretion whether a witness has been shown to have sufficient experience and opportunity of observation to render his opinion of value.' " (Citations omitted.) *Waldron* v. *Raccio*, 166 Conn. 608, 613–14, 353 A.2d 770 (1974).

We conclude that the trial court did not abuse its wide discretion in admitting Cromwell's opinion testimony.

## C

### CLAIM OF ERROR IN ALLOWING CROMWELL TO TESTIFY BEYOND THE SCOPE OF THE PRELIMINARY REPORT ADMITTED INTO EVIDENCE

The defendant claimed in his motions to set aside the verdict, as well as in objections overruled and properly excepted to at trial, that the trial court erred in allowing Cromwell to testify beyond the scope of the preliminary report. The defendant claims two general errors in this regard: (1) in admitting testimony as to the length of the Angelo vehicle and its placement on a particular map overlay; and (2) in admitting testimony as to the dynamics of the collision between the vehicles operated by the defendant and Hannelore Zimny.

The first of these two claims is based on the fact that Cromwell testified at trial that the Angelo vehicle was a maxivan rather than a van, a factor that was not included in the preliminary report. We conclude that was not a significant enough extension of Cromwell's

testimony to merit our attention. Concerning the second issue, the defendant claims that Cromwell testified to several other factors which were never mentioned in his preliminary report; the coefficient of friction; the national crash computer program; the specification for vehicles contained in the NADA handbook; the positioning of vehicles based on the center of gravity of each vehicle; and the various types of damage to each vehicle. The defendant points out that Cromwell's preliminary report does not even mention these elements which formed the basis for a substantial portion of his testimony.

We do not find that this testimony amounted to a significant extension of the preliminary reports. The trial court's statement at trial that the evidence was merely "an elaboration of what's contained in his report," and that the objection went to the weight, rather than the admissibility, of Cromwell's testimony is well taken. We find no error in this ruling.

## III

### ERROR IN FAILING TO SET ASIDE THE VERDICT AND ORDER A NEW TRIAL OR A REMITTITUR

The defendant claims that the verdict was excessive as a matter of law and that the trial court therefore erred in refusing to set aside the verdict and order a new trial or a remittitur. The defendant briefed only the trial court's denial of his motions for a remittitur. We therefore conclude that the claim of error as to denial of his motion for a new trial on the grounds of excessiveness of the verdict was abandoned. See *State* v. *Samaha,* 180 Conn. 565, 565 n.1, 430 A.2d 1290 (1980). The trial court articulated its denial of the defendant's motions for remittitur by stating that, in denying them, the court considered the $225,000 paid to the plaintiff as a result of the precedent settlement payments. Thus we must decide whether the court-

erred in concluding as a matter of law that the total sum of $1,074,171.90 plus $225,000, or $1,299,171.90, was excessive.[8]

The plaintiff's claim includes, of course, damages for Zimny's injuries and suffering before she died and for her ultimate death from those injuries. Zimny was nineteen years and ten months old at the time of the accident. She was admitted to the John Dempsey Hospital, after the accident, suffering a crush injury to her chest, including multiple rib fractures and a crushed right lung; a broken neck injury akin to a hanging type injury; and a lacerated liver with extensive bleeding into the abdominal cavity. Because of damage to her lungs, and the fact that her neck injury caused the upper part of her larynx to be ripped loose of the floor of her mouth, she could not breathe voluntarily. She was conscious and suffered severe pain which was described throughout her hospitalization as dramatically painful. She underwent many operations and surgical procedures including a laparotomy, multiple operations of her larynx, the drilling of holes in her head to install Crutchfield tongs, abdominal operations, a bronchoscopy, and the removal of her entire right lung. She was in an iron lung during her entire hospitalization and was drugged to maintain complete paralysis. On February 24, 1976, forty-five days after the accident, she bled to death as a result of her injuries.

Zimny was a student at Eastern Connecticut State College. She was a happy young woman who wished to become an elementary school teacher. She was an excellent student and an achiever. There was expert testimony that based upon a fifty-nine year life expectancy, the net economic loss to her estate was $624,118. The special damages totaled $71,459.36.

---

[8] We consider this matter on the basis of the gross award of $1,074,171.90 before the reduction of the jury's award by 20 percent due to the plaintiff's decedent's contributory negligence.

The law on this subject has recently been summarized by this court in *Zarrelli* v. *Barnum Festival Society, Inc.,* 6 Conn. App. 322, 326, 505 A.2d 25, cert. denied, 200 Conn. 801, 509 A.2d 516 (1986), wherein we stated: "A court should be especially hesitant to set aside a jury's award of damages. This is particularly true in a wrongful death case where '[i]t serves no useful purpose to compare a verdict in one . . . case with those in others. No one life is like any other, and the damages for the destruction of one furnish no fixed standard for others.' *Fairbanks* v. *State,* 143 Conn. 653, 661, 124 A.2d 893 (1956). The assessment of damages 'defies any precise mathematical computation'; *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 675, 136 A.2d 918 (1957); and, therefore, establishing damages for wrongful death is a task peculiarly within the expertise of a jury. *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 461, 439 A.2d 408 (1981); *McKirdy* v. *Cascio,* 142 Conn. 80, 85, 111 A.2d 555 (1955). 'However, it is the court's duty to set aside the verdict when it finds that "it does manifest injustice, and is . . . palpably against the evidence. . . ." *State* v. *Chin Lung,* 106 Conn. 701, 704, 139 A. 91 (1927).' *Barbieri* v. *Taylor,* [37 Conn. Sup. 1, 3, 426 A.2d 314 (1980)].[9]

" 'The trial court's refusal to set aside [a] jury verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness.' *Kalleher* v. *Orr,* 183 Conn. 125, 127, 438 A.2d 843 (1981); *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770 (1974). This is so because '[f]rom the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than [an appellate court] can, on the printed record, what factors, if any, could have improperly influenced

[9] Although the quoted language concerns the setting aside of a jury verdict its reasoning and authority is obviously equally applicable to the issue of a remittitur by the trial court.

the jury.' *Birgel* v. *Heintz,* 163 Conn. 23, 26, 301 A.2d 249 (1972). Our function on appeal is, accordingly, limited to determining whether the lower court abused its discretion in denying the plaintiffs' motion to set aside the verdict. Such a decision 'can be disturbed only by considerations of the most persuasive character, as where the verdict shocks the sense of justice or the mind is convinced that it is in fact entirely disproportionate to the injury. [Maltbie,] Conn. App. Proc., p. 151.' *Mulcahy* v. *Larson,* 130 Conn. 112, 114, 32 A.2d 161 (1943). The standard of review for an appellate court in a case like this was first stated in *Briggs* v. *Becker,* 101 Conn. 62, 66–67, 124 A. 826 (1924): '[T]he only practical test is whether the total damages awarded fall somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption.' It is important to note that *Briggs* and the cases that have followed do not require a direct showing of partiality, prejudice, mistake or corruption, but rather stand for the proposition that if the amount awarded 'shocks the sense of justice' as to what is reasonable, then the inferred conclusion is that the jury was misguided in reaching its decision. See generally *Raia* v. *Topehius,* 165 Conn. 231, 239, 332 A.2d 93 (1973); *Hook* v. *Dubuque,* 153 Conn. 113, 115, 214 A.2d 376 (1965)." (Footnote added.) *Zarrelli* v. *Barnum Festival Society, Inc.,* supra, 326–27.

Given the nature and extent of Zimny's injuries and the pain associated with them, the net economic loss to her estate and the special damages, the amount of damages in this case does not shock the sense of justice so as to compel the conclusion that the jury was influenced by ignorance, partiality, prejudice, or corruption. The court did not err in denying the defendant's motions for a remittitur.

## IV

### WHETHER GENERAL STATUTES § 52-216 VIOLATES THE EQUAL PROTECTION PROVISIONS OF THE UNITED STATES CONSTITUTION

The defendant in this case challenged the constitutionality of General Statutes § 52-216a[10] at the trial court, but he did not argue that it was unconstitutional on equal protection grounds. Rather, he argued in the trial court that § 52-216a, as amended after *Seals* v. *Hickey*, 186 Conn. 337, 441 A.2d 604 (1982), was unconstitutionally void for vagueness, and that the court was required to follow the common law by reducing any jury verdict by the amounts the plaintiff received by way of settlement. The court denied this claim. The defendant concedes that he did not raise the equal protection claim at trial but urges the court to review it nonetheless. This violates § 3063 of the Practice Book.[11] We see no reason to depart from the general rule that where an appellant has failed to alert the trial court to a legal claim, even of a constitutional nature, and

---

[10] General Statutes § 52-216a provides as follows: "An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. If the court concludes that the verdict is inadequate as a matter of law, it shall order an additur, and upon failure of the party so ordered to add the amount ordered by the court, it shall set aside the verdict and order a new trial. This section shall not prohibit the introduction of such agreement or release in a trial to the court."

[11] Practice Book § 3063, made applicable to this court by virtue of Practice Book § 2000, provides: "The supreme court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to trial."

attempts to raise the issue for the first time on appeal, this court will not consider the issue. *Peck* v. *Jacquemin*, 196 Conn. 53, 62 n.13, 491 A.2d 1043 (1985); *Chaplin* v. *Balkus*, 189 Conn. 445, 447–48, 456 A.2d 286 (1983); *Sands* v. *Sands*, 188 Conn. 98, 106–107, 448 A.2d 822 (1982), cert. denied, 459 U.S. 1148, 103 S. Ct. 792, 74 L. Ed. 2d 997 (1983).

## V

### SUFFICIENCY OF THE EVIDENCE

The defendant's final claim is that the evidence of his liability was insufficient to support the jury's verdict. At the close of the plaintiff's case, the defendant moved for a directed verdict upon which the court reserved decision. After the jury verdict was rendered, the defendant made two motions, one to set aside the verdict, and one for judgment pursuant to Practice Book §§ 320 and 321. The court denied all of these motions.

A trial court in passing upon a motion to set aside a verdict, and this court in reviewing its action thereon is limited by established legal principles. Our rule is clear and long-standing although it has been stated in a variety of ways. "If, on the evidence as presented and under the pleadings, the jury could have reasonably found in accordance with the verdict as rendered, then it cannot be set aside as against the evidence." *Goodman* v. *Norwalk Jewish Center, Inc.*, 145 Conn. 146, 154, 139 A.2d 812 (1958); see also *Horvath* v. *Tontini*, 126 Conn. 462, 464, 11 A.2d 846 (1940).

It is the trial court's duty to protect the parties by setting aside a verdict where its manifest injustice is so plain as clearly to indicate that the jury has disregarded the rules of law applicable to the case; *Jacobs* v. *Goodspeed*, 180 Conn. 415, 417, 429 A.2d 915 (1980); or was influenced by ignorance, prejudice, corruption

or partiality in reaching a decision. *Kalleher* v. *Orr,* 183 Conn. 125, 126, 438 A.2d 843 (1981); *Preisner* v. *Illman,* 1 Conn. App. 264, 268, 470 A.2d 1237 (1984). In setting aside the verdict, the trial court acts in the exercise of a broad legal discretion which, in the absence of a clear abuse, will not be disturbed; and in reviewing the exercise of that discretion every reasonable presumption should be indulged in favor of its correctness. *Jacobs* v. *Goodspeed,* supra, 416; *Balboni* v. *Stonick,* 2 Conn. App. 523, 526–27, 481 A.2d 82 (1984). Accordingly, in reviewing a jury verdict in relation to a claim of insufficiency of the evidence, the evidence must be viewed in the light most favorable to the plaintiff. See *Meyer* v. *Barnes,* 2 Conn. App. 485, 486, 479 A.2d 1236 (1984).

We must reiterate the fact that a court should be especially hesitant to set aside a jury's award of damages. " 'The trial court's refusal to set aside [a] jury verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness.' " *Zarrelli* v. *Barnum Festival Society, Inc.,* supra, 326; *Kalleher* v. *Orr,* supra, 127.

In his brief the defendant cites detailed testimony which he claims proves not only evidence of the defendant's non-negligent conduct, but also that the accident was unavoidable. He stresses: (1) testimony of the defendant, his mother, and his sister that while their vehicle travelled on the bridge it was struck very hard twice in the rear by another vehicle later determined to be the Zimny vehicle; (2) his own testimony that his vehicle never spun out either clockwise or counterclockwise and that the front of his car did not collide with or strike the right side of the Zimny vehicle; (3) the testimony of Gaylord concerning the very slippery road conditions; (4) Gaylord's testimony that the cause of the accident was weather conditions and not any-

thing that any of the operators did; (5) the testimony of Gaylord and Cromwell that the fatal accident was separate and distinct from the Hogan-Zimny accident; (6) various discrepancies in witnesses' testimony, particularly that of the decedent's mother.

The plaintiff claims that there was credible evidence of the following: The defendant, who had been proceeding eastbound on I-84 from Waterbury to the accident scene, knew or should have known that the road surface to the west of the accident was slippery and hazardous. When the defendant came upon the scene of the Lundy collision and saw that the highway was partially obstructed, he nonetheless attempted to proceed through the obstruction. The defendant was operating his vehicle at a rate of speed greater than that of the Zimny vehicle and sought to pass the Zimny vehicle. Because of the defendant's speed, his location on the highway, and the condition of the highway, he lost control of his vehicle and collided with the Zimny vehicle. The collision of the defendant's vehicle with the Zimny vehicle forced the Zimny vehicle into the left curbing of the highway, where it came to rest. The defendant thus left the Zimny vehicle and its occupants in a position of peril. Thereafter and in the course of seeking to effect a rescue of her mother from a position of peril caused by the defendant, the decedent was struck and severely injured by a tractor trailer.

It is axiomatic that the jury is the judge of the credibility of witnesses. *Balboni* v. *Stonick,* supra, 529. With his sufficiency of the evidence claim, the defendant is in effect attempting to retry the case. This is an extremely complex case in which the jury heard not only from all the surviving participants in the accident, but also from five police officers, a reconstruction expert and a meteorologist. Because of the significance of the case, and the compli-cated fact pattern, we have examined with care the

portions of the transcript cited by the parties. We conclude that there was credible evidence from which the jury could reasonably have found that the defendant was negligent and was the proximate cause of the accident that resulted in the plaintiff's injuries and death. The trial court did not abuse the broad discretion vested in it in denying the defendant's motion to overturn the verdict.

We find no error.

In this opinion the other judges concurred.